# UNITED DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2015 DEC 29 PM 3: 58

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

|  |  |
|---|---|
| MARY BELL, JANICE GRIDER, AND CINDY PROKISH, individually and as representatives of a class of similarly situated persons of the Anthem 401(k) Plan (formerly the WellPoint 401(k) Retirement Savings Plan), | CIVIL ACTION NO. |
|  | COMPLAINT—CLASS ACTION |
|  | JURY TRIAL DEMANDED |
| *Plaintiffs,* | 1 : 15 -cv- 2 0 6 2 TWP -DML |
| v. |  |
| ANTHEM, INC., PENSION COMMITTEE OF ATH HOLDING COMPANY, LLC, BOARD OF DIRECTORS OF ANTHEM, INC., JOSEPH R. SWEDISH, GEORGE A. SCHAEFER, JR., R. KERRY CLARK, ROBERT L. DIXON, JR., LEWIS HAY III, JULIE A. HILL, RAMIRO G. PERU, WILLIAM J. RYAN, ELIZABETH E. TALLETT, ANGELA F. BRALY, LENOX D. BAKER, JR., SUSAN B. BAYH, SHEILA P. BURKE, WILLIAM H.T. BUSH, WARREN Y. JOBE, VICTOR S. LISS, JANE G. PISANO, JACKIE M. WARD, AND JOHN DOES 1–20, |  |
| *Defendants.* |  |

1.       Plaintiffs Mary Bell, Janice Grider, and Cindy Prokish, individually and as representatives of a class of participants and beneficiaries of the Anthem 401(k) Plan (formerly the WellPoint 401(k) Retirement Savings Plan, "Plan"), bring this action under 29 U.S.C. §§1132(a)(2) and (3) on behalf of the Plan against Defendants Anthem, Inc., the Pension Committee of ATH Holding Company, LLC,

the Board of Directors of Anthem, Inc., Joseph R. Swedish, George A. Schaefer, Jr.,

R. Kerry Clark, Robert L. Dixon, Jr., Lewis Hay III, Julie A. Hill, Ramiro G. Peru,

William J. Ryan, Elizabeth E. Tallett, Angela F. Braly, Lenox D. Baker, Jr., Susan

B. Bayh, Sheila P. Burke, William H.T. Bush, Warren Y. Jobe, Victor S. Liss, Jane

G. Pisano, Jackie M. Ward and John Does 1–20 for breach of fiduciary duties.

2.     Today, 401(k) defined contribution plans, in which the employee's

retirement assets are at risk of high fees and underperformance, have become

America's primary retirement system, departing from traditional defined benefit

(pension) plans where the employer assumes the risk.[1] With over $5 billion in

assets, the Plan is in the top *0.08%*—less than 1%—of over 620,000 401(k) plans

offered to participants based on plan assets.[2] The marketplace for 401(k) retirement

plan services is established and competitive. Multi-billion dollar defined

contribution plans, like the Plan, have tremendous bargaining power to demand

low-cost administrative and investment management services. As fiduciaries to the

Plan, Defendants are obligated to act for the exclusive benefit of participants and

beneficiaries and ensuring that plan expenses are reasonable. These duties have

been defined as the "highest known to the law", which must be done with "an eye

single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*,

680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of using the Plan's bargaining

power to benefit participants and beneficiaries, Defendants allowed unreasonable

---

[1] Nancy Trejos, *Retirement Wreck,* WASHINGTON POST (Oct. 12, 2008), available at
http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.
[2] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* at
11 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

expenses to be charged to participants for administration of the Plan, and selected and retained high-cost and poor-performing investments compared to available alternatives.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District and Division are the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## PARTIES

### The Anthem 401(k) Plan

6.     The Anthem 401(k) Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). Effective

December 2, 2014, the Plan changed its name from the WellPoint 401(k) Retirement Savings Plan.

7.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a).

8.    The Plan provides for retirement income for employees of Anthem, Inc. and certain of its subsidiaries. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and from the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

9.    Anthem, Inc. established a trust ("Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments less payments made by the Plan's trustee to carry out the purposes of the Trust, in accordance with 29 U.S.C. §1103.

10.   As of December 31, 2014, the Plan is one of the country's largest 401(k) plans, and is what is known as a jumbo plan with over $5.1 billion in total assets and over 59,000 participants with account balances.

### Plaintiffs

11.   Mary Bell resides in Fountaintown, Indiana, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

4

12.     Janice Grider resides in Beech Grove, Indiana, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

13.     Cindy Prokish resides in New Whiteland, Indiana, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

### Defendants

14.     Anthem, Inc. (formerly WellPoint, Inc.) is a for-profit domestic corporation organized under Indiana law with its principal place of business in Indianapolis, Indiana. WellPoint, Inc. amended its articles of incorporation to change its name to Anthem Inc. on December 2, 2014. Anthem, Inc. acts through its officers and its Board of Directors. Upon information and belief, Anthem, Inc. is authorized to designate a person or a committee to act on behalf of Anthem, Inc. with respect to the Plan, and is designated as a fiduciary under the Plan. As described in ¶21, Plaintiffs are compelled to make the allegations described herein as "upon information and belief" because Anthem has refused to provide Plaintiffs the plan documents they have requested under 29 U.S.C. §1024(b), which requires Anthem to do so.

15.     Anthem, Inc. administers the Plan through its subsidiaries. ATH Holding Company, LLC, a wholly owned subsidiary of Anthem, Inc., is the Plan Sponsor. Sponsorship of the Plan was transferred to ATH Holding Company, LLC effective December 31, 2006 by Anthem Insurance Companies, Inc. ATH Holding

Company, LLC is a domestic limited liability corporation organized under Indiana law with its principal place of business in Indianapolis, Indiana.

16. Upon information and belief, the Pension Committee of ATH Holding Company, LLC (formerly the Pension Committee of Anthem Insurance Companies, Inc., "Pension Committee") is a named fiduciary under the Plan and 29 U.S.C. §1102(a), and the Plan Administrator under 29 U.S.C. §1002(16)(A)(i). The Pension Committee is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercised discretionary authority or control respecting the management of the Plan or disposition of its assets, and exercised discretionary authority or responsibility in the administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. The Pension Committee may designate in writing persons other than its members to carry out any of its duties and responsibilities. Upon information and belief, any delegation must be set forth in the Plan.

17. Upon information and belief, the Board of Directors of Anthem, Inc. has the sole authority to appoint and remove members of the Pension Committee, amend or terminate, in whole or part, the Plan or the Trust, and is designated as a fiduciary under the Plan.

18.     The current members of the Board of Directors of Anthem, Inc. are

Joseph R. Swedish (who also is Anthem's Chief Executive Officer), George A.

Schaefer, Jr., R. Kerry Clark, Robert L. Dixon, Jr., Lewis Hay III, Julie A. Hill,

Ramiro G. Peru, William J. Ryan, and Elizabeth E. Tallett. Former Board members

include: Angela F. Braly (former Chief Executive Officer), Lenox D. Baker, Jr.,

Susan B. Bayh, Sheila P. Burke, William H.T. Bush, Warren Y. Jobe, Victor S. Liss,

Jane G. Pisano, and Jackie M. Ward.

19.     Upon information and belief, Anthem, Inc. has the ultimate

discretionary authority or control regarding management of the Plan or

management or disposition of the Plan's assets, and administered the Plan through

its Board of Directors and officers and employees of Anthem, Inc., including

members of the Pension Committee.

20.     Plaintiffs are currently unaware of the identities of the individual

members of the Pension Committee. Those individuals are collectively named as

John Does 1–20. Plaintiffs will substitute the real names of the John Does when

Plaintiffs know them.

21.     Prior to the filing of this complaint, Plaintiffs requested information

from the Plan Administrator under 29 U.S.C. §1024, which requires among other

production, furnishing documents or instruments under which the Plan is

established or operated. Despite its statutory obligation to respond to requests for

information made by participants, the Plan Administrator refused to comply with

Plaintiffs' request, which was made on multiple occasions, specifically, on October 5

and October 27, 2015. Because of these refusals and clear statutory violations, Plaintiffs cannot fully determine which of the Anthem entities or committee members described above engaged in certain specific fiduciary breaches described below.[3] Because all of those individual entities have acted as alleged herein as the agents of Anthem, Inc., and/or co-fiduciaries, all defendants are collectively referred to hereafter as Anthem.

## FACTS APPLICABLE TO ALL COUNTS

### Plan Investments

22.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Accordingly, poor investment performance and unreasonable fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. See, e.g., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013)(illustrating impact of expenses with example in which a 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[4]

---

[3] For instance, without the required production as set forth above, it is plausible that the Board of Directors of Anthem Insurance Companies, Inc. is the fiduciary responsible for appointing the members of the Pension Committee.

[4] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

23.     Anthem controlled the available investment options in which the participants could invest their retirement assets.

24.     As of December 31, 2014, Anthem offered eleven Vanguard mutual funds, Vanguard collective trust target date funds, two non-Vanguard mutual funds, and an Anthem, Inc. common stock fund. Those investment funds and the amount of Plan assets in them are set forth below.[5]

| Investment Options[6] | 2014 |
|---|---|
| Artisan Midcap Value Fund-Instl | $   146,282,151 |
| Touchstone Sands Capital Select Growth Fund-Instl | $   133,320,126 |
| Vanguard Prime Money Market Fund-Instl | $   461,859,199 |
| Vanguard Institutional Index Fund-Instl Plus | $   712,889,172 |
| Vanguard Total Bond Market Index Fund-Instl Plus | $   422,673,640 |
| Vanguard Wellington Fund-Adm | $   367,536,367 |
| Vanguard Total International Stock Index Fund-Instl Plus | $   376,245,825 |
| Vanguard PRIMECAP Fund-Adm | $   371,029,292 |
| Vanguard Extended Market Index Fund-Instl Plus | $   297,618,761 |
| Vanguard Windsor II Fund-Adm | $   210,272,166 |
| Vanguard Explorer Fund-Adm | $   116,025,228 |
| Vanguard Inflation-Protected Securities Fund-Adm | $   35,784,318 |
| Vanguard International Growth-Adm | $   3,567,062 |

---

[5] See 2014 Anthem 401(k) Plan Form 5500.
[6] "Instl" refers to the institutional share class, "Instl Plus" refers to the institutional plus share class, and "Adm" refers to the admiral share class.

| Investment Options[6] | 2014 |
|---|---|
| Vanguard Target Retirement 2010 Trust Plus | $      9,436,509 |
| Vanguard Target Retirement 2015 Trust Plus | $   136,971,831 |
| Vanguard Target Retirement 2020 Trust Plus | $     64,189,161 |
| Vanguard Target Retirement 2025 Trust Plus | $   287,328,228 |
| Vanguard Target Retirement 2030 Trust Plus | $     46,164,963 |
| Vanguard Target Retirement 2035 Trust Plus | $   217,834,649 |
| Vanguard Target Retirement 2040 Trust Plus | $     32,571,919 |
| Vanguard Target Retirement 2045 Trust Plus | $   121,974,410 |
| Vanguard Target Retirement 2050 Trust Plus | $     18,589,195 |
| Vanguard Target Retirement 2055 Trust Plus | $       5,674,840 |
| Vanguard Target Retirement 2060 Trust Plus | $       1,992,567 |
| Vanguard Target Retirement Income Trust Plus | $     36,697,926 |
| Anthem, Inc. Common Stock | $   312,328,676 |

25.    With the exception of changes in share classes for mutual funds and replacement of certain mutual funds in favor of collective trusts, Anthem has offered these Vanguard investments and the Touchstone fund throughout the relevant time period. The Artisan Mid Cap Value Fund was added to the Plan during 2012.

## Plan Recordkeeper

26.    The Vanguard Group, Inc. serves as the recordkeeper to provide administrative and recordkeeping services to the Plan. Vanguard Fiduciary Trust

10

Company serves as the Plan's trustee tasked with certain duties and responsibilities, including but not limited to: investing Plan assets in accordance with the investment directions provided by the Plan Administrator or participants, and paying all benefits and expenses from the Trust upon the written direction of the Plan Administrator. The Vanguard entities are hereafter collectively referred to as "Vanguard". Vanguard has served in these roles throughout the relevant time period.

### Unreasonable Investment Management Fees from Excessively High-Priced Investment Options

27.     Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

11

28.     Many Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management*, 47 FIN. ANALYSTS J. 7, 8 (January/February 1991).[7]

29.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

30.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual*

---

[7] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

*Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses,* 55 J. FIN. 1655, 1690 (2000).

31.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

32.     Anthem selected high-priced share classes of mutual funds, instead of *identical* lower-cost share classes of those same mutual funds which were readily available to the Plan. Anthem also failed to adequately investigate and to offer non-mutual fund alternatives, such as collective trusts and separately managed accounts prior to 2013. Holders of large pools of assets know that these investment vehicles are readily available to them and can be used for the same investment style and with the same portfolio manager, but are much lower priced. Each mutual fund in the Plan charged fees far in excess of the rates Anthem could have obtained for the Plan by using these comparable products.

### A. *Excessive fees compared to lower-cost share classes* of the *Plan's identical mutual fund options*

33.     It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees that can be obtained in the market. Thus, large retirement plans have substantial bargaining power to negotiate low fees for investment management services.

34.     Jumbo retirement plans, such as the Plan, have much more bargaining power to negotiate low fees for investment management services than even large plans.

35.     Lower-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, like the Plan, or even smaller asset holders, that meet minimum investment amounts for these share classes.

36.     Until July 22, 2013, for the exact same mutual fund option, instead of using the size of the Plan to benefit participants as required, Anthem provided much higher-cost share classes of Plan investment options than were easily available to the Plan based on its size. It was not until that time that Anthem eliminated the high-priced mutual funds from the Plan. Describing this change, Anthem noted:

> During 2013, the Plan restructured the investments offered to participants. Target Date Retirement mutual funds were moved to similar collective trusts. Other mutual funds were moved from Investor shares to Institutional shares. These moves maintained the underlying investments available to Participants and lowered expense ratios.[8]

37.     Lower-cost identical institutional mutual fund alternatives to the Plan's mutual funds included the following:

---

[8] 2013 Form 5500, Fin. Stmts and Suppl. Sch. at n.3.

| Plan Investment  Options[9] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Vanguard Prime Money Market Fund (Inv) (VMMXX) | 16 bps | VMRXX | 9 bps | 78% |
| Vanguard Institutional Index Fund (Instl) (VINIX) | 4 bps | VIIIX | 2 bps | 100% |
| Vanguard Total Bond Market Index Fund (Inv) (VBMFX) | 20 bps | VBMPX | 5 bps | 300% |
| Vanguard Wellington Fund (Inv) (VWELX) | 26 bps | VWENX | 18 bps | 44% |
| Vanguard Total International Stock Index Fund (Inv) (VGTSX) | 22 bps | VTPSX | 10 bps | 120% |
| Vanguard PRIMECAP Fund (Inv) (VPMCX) | 45 bps | VPMAX | 36 bps | 25% |
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 24 bps | VEMPX | 6 bps | 300% |
| Vanguard Windsor II Fund (Inv) (VWNFX) | 36 bps | VWNAX | 28 bps | 29% |
| Vanguard Explorer Fund (Inv) (VEXPX) | 50 bps | VEXRX | 34 bps | 47% |
| Vanguard Inflation-Protected Securities Fund (Inv) (VIPSX) | 20 bps | VIPIX | 7 bps | 186% |
| Artisan Mid Cap Value Fund (Inv) (ARTQX) | 120 bps | APHQX | 98 bps | 22% |

---

[9] Expense ratios were obtained from Morningstar, a provider of independent investment research. See www.morningstar.com. "Bps" refers to basis points. One hundred basis points is 1.0%. In 2013, Anthem reported to participants that the Touchstone fund charged 118 bps.

| Plan Investment Options[9] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Touchstone Select Growth Fund (Y) (CFSIX) | 103 bps | CISGX | 80 bps | 48% |

38.    These lower-cost share classes of the identical mutual funds were available to the Plan many years before Anthem restructured the investment lineup in 2013. In fact, 7 of the 12 lower-cost options were available since the late 1990s or early 2000s.[10]

| Identical Lower-Cost Mutual Fund Option | Inception Date |
|---|---|
| Vanguard Prime Money Market Fund-Instl | 10/3/1989 |
| Vanguard Institutional Index Fund -Instl Plus | 7/7/1997 |
| Vanguard Total Bond Market Index Fund-Instl Plus | 9/17/1995 |
| Vanguard Wellington Fund-Adm | 5/13/2001 |
| Vanguard Total International Stock Index Fund-Instl Plus | 11/29/2010 |
| Vanguard PRIMECAP Fund-Adm | 11/11/2001 |
| Vanguard Extended Market Index Fund-Instl Plus | 1/13/2011 |

---

[10] For Vanguard fund inception dates, see https://institutional.vanguard.com. For the Artisan Mid Cap Value Fund-Instl, see the fund's prospectus dated Feb. 1, 2015, available at https://www.sec.gov/Archives/edgar/data/935015/000119312515023706/d838378d485bpos.htm. For the Touchstone Select Growth Fund-Instl, see the fund's prospectus dated Apr. 15, 2015, available at https://www.sec.gov/Archives/edgar/data/1174490/000110465915030050/a15-6498_1485bpos.htm.

| Identical Lower-Cost Mutual Fund Option | Inception Date |
|---|---|
| Vanguard Windsor II Fund-Adm | 5/13/2001 |
| Vanguard Explorer Fund-Instl | 12/12/2003 |
| Vanguard Inflation-Protected Securities Fund-Instl | 12/11/2003 |
| Artisan Mid Cap Value Fund-Instl | 2/1/2012 |
| Touchstone Select Growth Fund-Instl | 1/21/2005 |

39.     Despite the availability of much lower-cost share classes for the Plan's mutual fund options, Anthem only recently replaced these higher-cost share classes with their lower-cost versions effective July 22, 2013. Plan participants thus paid far higher fees than they should have, which resulted in receiving lower returns on their retirement investments, and fewer retirement assets to build for the future, than they would have obtained had Defendants performed their fiduciary duties.

40.     Had the amounts invested in the higher-cost share classes instead been invested in the much lower-cost versions of the Plan's mutual fund options from December 29, 2009 through July 22, 2013, Plan participants would not have lost over $18 million of their retirement savings through unnecessary expenses.[11]

### B. *Excessive fees compared to other mutual funds*

41.     Besides being much higher than the fees identical institutional share classes of the same mutual funds charge, the fees charged for certain of the Plan's mutual fund investments are far higher than reasonable investment management

---

[11] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 Index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

fees for such funds. These fees were and are significantly higher than comparable institutional mutual funds available to 401(k) plans, including actively managed and passively managed index Vanguard institutional funds with similar investment styles that were readily available as Plan investment options.

42.     For instance, the Artisan Mid Cap Value Fund and the Touchstone Sands Capital Select Growth Fund were and are the most expensive investment options in the Plan, each holding over $130 million in assets. Prior to the July 22, 2013 share class changes, the Plan's Artisan fund and the Touchstone fund were up to *12 times* more expensive than available Vanguard alternatives in the same investment style.

| Mutual Fund Investment | Plan Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Artisan Mid Cap Value Fund | 120 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) (passive) | 9 bps | 1233% |
| | | Vanguard Selected Value Fund (VASVX) (active) | 43 bps | 179% |
| Touchstone Select Growth Fund | 103 bps | Vanguard Growth Index (Instl) (VIGIX) (passive) | 8 bps | 1188% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) (active) | 31 bps | 232% |

43.     Even after the share class changes, as of December 31, 2014, the fees for these mutual fund options were up to *9 times* more expensive than available Vanguard alternatives in the same investment style.

18

| Mutual Fund Investment | Plan Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Artisan Mid Cap Value Fund | 95 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 9 bps | 956% |
| | | Vanguard Selected Value Fund (VASVX) | 41 bps | 132% |
| Touchstone Select Growth Fund | 79 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 900% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 167% |

44.     Had the amounts invested in the Plan's mutual fund investments instead been invested in the lower-cost mutual funds offered from other mutual fund providers in the same investment style readily available to the Plan, Plan participants would not have lost millions of dollars in their retirement savings through excessive fees.

### C. *Excessive fees compared to separate accounts*

45.     Large retirement plans, including those with assets over $500 million, can hire investment advisers directly to manage separate accounts tailored for the plan within plan-specific investment parameters and even using the same investment managers as mutual funds with the same investment style. Use of such accounts greatly reduces the cost of investing with the same adviser through a retail mutual fund.

46.     According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per

19

account, can "commonly" reduce "[t]otal investment management expenses" by *one-fourth of the expenses incurred through retail mutual funds.*" U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses,* §2.4.1.3 (Apr. 13, 1998)(emphasis added).[12]

47.     As the Plan had assets of well over $1 billion at all relevant times, separate accounts were readily available to obtain these economies of scale offered in the marketplace.

48.     Separate accounts have numerous advantages over mutual funds in a 401(k) plan, including the ability to negotiate fees, control by the plan sponsor over the investment guidelines, ability to avoid marketing fees built into the cost of mutual funds,[13] and ability to avoid holding significant cash for shareholder redemption.[14] In a mutual fund, all investors are charged the same fee, and investors have no ability to modify the fund's investment guidelines, which are set by the fund's investment adviser. In a separate account, the plan sponsor can negotiate the best possible fee for the plan using its bargaining power, and can tailor the investment guidelines to fit the demographics of the workforce.

49.     While certain of the Plan's options after 2013 offered institutional share classes for the mutual funds, they did not, and still do not, capture the lower expenses available given the size of the Plan's investment in each fund. For

---

[12] On the Department of Labor's website at http://www.dol.gov/ebsa/pdf/401krept.pdf.

[13] Mutual fund expense ratios include fees for marketing costs, which are wholly unnecessary in a 401(k) plan since participants cannot choose funds other than those provided by the plan's fiduciaries. 401(k) participants receive no benefit from paying marketing costs for mutual funds in the plan.

[14] Unlike mutual fund shareholders, 401(k) participants rarely make trades in their account. Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeski Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans,* at 17–18 (June 2006), available at http://www.mrrc.isr.umich.edu/publications/Papers/pdf/wp115.pdf.

instance, the Plan previously offered the retail share class of the Artisan Mid Cap Value Fund, which charged 120 bps, and the "Y" share class of the Touchstone Sands Capital Select Growth Fund, which charged 103 bps. The Touchstone fund also offered a retail share class. Prior to July 22, 2013, had the Plan obtained separate accounts with expenses of one-fourth the costs of the retail shares, the Plan's expenses would have been reduced dramatically.

| Retail Share Class of Plan's Mutual Funds | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Artisan Mid Cap Value Fund (ARTQX) | 120 bps | 30 bps | 120 bps | 300% |
| Touchstone Sands Capital Select Growth Fund (TSNAX) | 137 bps | 34 bps | 103 bps | 203% |

50.    Even *after* the Plan's transition to institutional share classes for these funds on July 22, 2013, the Plan continued to pay excess fees compared to the DOL separate account fee as of December 31, 2014.

| Plan's Institutional Share Class | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|
| Artisan Mid Cap Value Fund (APHQX) | 30 bps | 95 bps | 217% |
| Touchstone Sands Capital Select Growth Fund (CISGX) | 34 bps | 79 bps | 132% |

51. Separately, the investment adviser or subadviser of the above-referenced mutual funds also offered lower-cost separate accounts with the same investment strategy.

52. Artisan Partners Limited Partnership, the same investment adviser of the mutual fund Artisan Mid Cap Value Fund, offers separate accounts for domestic mid cap value accounts. The maximum fee schedule, which is subject to negotiation, is as follows: (1) 80 bps on first $50 million in assets; (2) 60 bps on the next $50 million; and (3) 50 bps on assets above $100 million.[15] With over $146 million in assets invested in the Plan's Artisan Mid Cap Value Fund as of December 31, 2014, the published annual fee charged for the Artisan separate account, even before negotiation due to the size of the assets, is well below the expenses charged for the retail and institutional share classes of the Artisan mutual fund. For example, applying the published, pre-negotiation fee schedule to the fund's assets, the retail share class is *over 87% more expensive*, and the institutional share class is *over 48% more expensive*, than the lower-cost Artisan separate account at a maximum fee of 64 bps before negotiation due to asset size.

53. Sands Capital Management, LLC, the same subadviser of the mutual fund Touchstone Sands Capital Select Growth Fund, offers separate accounts for the select growth investment strategy. The maximum fee schedule, which is subject to negotiation, is as follows: (1) 75 bps on first $50 million in assets; and (2) 50 bps

---

[15] See Artisan Partners Limited Partnership Form ADV at 14 (Mar. 31, 2015), available at http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VR SN_ID=306440.

on assets above $100 million.[16] With over $133 million in assets invested in the Plan's Touchstone Sands Capital Select Growth Fund as of December 31, 2014, the published annual fee charged for the Sands Capital separate account, even before negotiation based on the size of the assets, is well below the expenses charged for the retail and institutional share classes of the Touchstone mutual fund. For example, applying the published, pre-negotiation fee schedule to the fund's assets, the "Y" share class is *over 74% more expensive*, and the institutional share class is *over 33% more expensive*, than the lower-cost Sands Capital separate account estimated at a maximum fee of 59 bps before negotiation due to asset size.

54.     These separate accounts only represent a fraction of separate accounts that were available to the Plan in similar investment styles from other investment management firms at a much lower cost than the Plan's mutual funds.

55.     Had Anthem selected separate accounts for the Plan's investments instead of retail and institutional share class mutual funds, Plan participants would not have lost millions of dollars in their retirement savings due to unreasonable expenses throughout the relevant time period.

### D. *Excessive fees compared to collective trusts*

56.     Collective trusts also provide much lower investment management fees than the Plan's mutual funds, and in some instances, separate accounts. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million or more in total plan assets.

---

[16] See Sands Capital Management, LLC Form ADV at 5 (Mar. 31, 2015), available at http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=305828.

57.     Vanguard offers low-cost collective trust funds to qualified retirement plans in several asset styles, including large cap domestic equities, small cap equities, international equities, and target date funds.

58.     For large cap domestic equities, as an example, Vanguard offers the collective trust Vanguard Employee Benefit Index, which is comparable to the Plan's Vanguard Institutional Index mutual fund. Depending on the fee negotiations between the plan fiduciary and Vanguard, and the amount of investable assets for the mandate, the collective trust version has lower fees and better performance than the mutual fund equivalent.[17] This collective trust alternative has been offered since September 30, 1985.

59.     With respect to target date funds, Vanguard currently offers five different collective trust funds, including Target Retirement Trust Select, Target Retirement Trust Plus, and Target Retirement Trust I–III. These funds, which are target date funds, have far lower fees than the Vanguard target date mutual funds used in the Plan and are managed by the same investment adviser as those mutual funds.

60.     Prior to July 22, 2013, the Plan invested in the higher-cost mutual fund version of the Vanguard Target Retirement Funds, even though much lower-cost collective trust Vanguard target date funds were available to the Plan. The

---

[17] See Vanguard Employee Benefit Index Fund Fact Sheet as of Sept. 30, 2015, available at https://institutional.vanguard.com/iippdf/pdfs/FS528R.pdf; Vanguard Institutional Index Fact Sheets for institutional plus and institutional shares as of Sept. 30, 2015, available at https://institutional.vanguard.com/iippdf/pdfs/FS854R.pdf (instl. plus), https://institutional.vanguard.com/iippdf/pdfs/FS94R.pdf (instl.).

lower-cost collective trust alternatives to the Plan's target date mutual fund options

included the following:

| Plan's Vanguard Mutual Fund Target Date Funds | Plan's Vanguard Mutual Fund Fee | Vanguard Collective Trust Fund Fee | Plan's Excess |
|---|---|---|---|
| Vanguard Target Retirement 2010 (VTENX) | 16 bps | 8 bps | 100% |
| Vanguard Target Retirement 2015 (VTXVX) | 16 bps | 8 bps | 100% |
| Vanguard Target Retirement 2020 (VTWNX) | 16 bps | 8 bps | 100% |
| Vanguard Target Retirement 2025 (VTTVX) | 17 bps | 8 bps | 113% |
| Vanguard Target Retirement 2030 (VTHRX) | 17 bps | 8 bps | 113% |
| Vanguard Target Retirement 2035 (VTTHX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2040 (VFORX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2045 (VTIVX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2050 (VFIFX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2055 (VFFVX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2060 (VTTSX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement Income (VTINX) | 16 bps | 8 bps | 100% |

61.     The Vanguard lower-cost collective trust funds were available to the Plan well before Anthem restructured the investment lineup in 2013. In fact, 10 of the 12 target date funds were available in 2007.[18]

| Vanguard Target Date Collective Trust Fund | Inception Date |
|---|---|
| Vanguard Target Retirement Trust 2010 | 6/21/2007 |
| Vanguard Target Retirement Trust 2015 | 6/27/2007 |
| Vanguard Target Retirement Trust 2020 | 6/21/2007 |
| Vanguard Target Retirement Trust 2025 | 6/27/2007 |
| Vanguard Target Retirement Trust 2030 | 6/27/2007 |
| Vanguard Target Retirement Trust 2035 | 6/28/2007 |
| Vanguard Target Retirement Trust 2040 | 6/29/2007 |
| Vanguard Target Retirement Trust 2045 | 6/30/2007 |
| Vanguard Target Retirement Trust 2050 | 6/27/2007 |
| Vanguard Target Retirement Trust 2055 | 10/4/2010 |
| Vanguard Target Retirement Trust 2060 | 2/29/2012 |
| Vanguard Target Retirement Income Trust | 6/21/2007 |

62.     Despite the availability of far lower-cost collective trust target date funds from the exact same investment manager Vanguard, Anthem only recently replaced these higher-cost mutual funds with their lower-cost collective trust version in 2013.

---

[18] Collective trust information provided on Vanguard's website for institutional investors, available at https://institutional.vanguard.com/.

63.     During 2014, Anthem reduced expenses for the target date investors by offering a still lower-cost version of the Vanguard collective trust target date funds, referred to as the Vanguard Target Retirement Trust Plus. The Target Retirement Trust Plus Funds, with an expense ratio of 6 bps, charge 25% lower expenses than the Retirement Trust I Funds with an expense ratio of 8 bps. With the exception of the 2055 and 2060 target date funds, these funds have been in existence since August 14, 2011, and were readily available to the Plan fiduciaries, but were not used for years.

64.     Had the amounts invested in the higher-cost target date mutual funds instead been invested in the lower-cost collective trust target date funds, Plan participants would not have lost millions of dollars in their retirement savings due to unreasonable expenses.

65.     Overall, had Anthem selected collective trusts for the Plan's investments instead of retail and institutional share class mutual funds, Plan participants would not have lost millions of dollars in their retirement savings due to unreasonable expenses throughout the relevant time period.

## Excessive Administrative Fees

66.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to a jumbo defined contribution plan, like the Plan, and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best

price. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 50,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

67. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to excessive fees.

68. Mutual funds have thousands of shareholders and the expense ratio for those funds includes within it a portion for recordkeeping those thousands of shareholders' accounts. However, since a mutual fund in a 401(k) plan has only one aggregate amount in the plan to track, the recordkeeping must be done by the plan for each participant. In these circumstances, some mutual funds engage in a practice known as revenue sharing.

69. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing recordkeeping

and administrative services for the mutual fund. Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, flat per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Because revenue sharing payments are asset based, they can bear no relation to a reasonable recordkeeping fee and can provide excessive compensation.

70.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing recordkeeping services, the payments can effectively be "kickbacks" for including the fund in a plan's investment lineup. There are vendors readily available that do recordkeeping only and do not sell investment products. These vendors offer pricing on a pure per-participant basis, without any revenue sharing component.

71.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years, and monitor recordkeeping costs regularly within that period.

72.     In order to make an informed assessment as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider.

73.     Anthem must monitor the compensation received by the Plan's recordkeeper, Vanguard. The Plan's recordkeeping fees became excessive in part because Anthem failed to monitor and control the amount of hard dollar and asset-based revenue sharing amounts allocated to Vanguard. A hard dollar fee refers to a direct payment charged to the participant's account rather than an indirect or revenue sharing payment from the mutual fund.

74.     Prior to September 30, 2013, Vanguard was compensated based on a combination of both hard dollar fees and asset-based revenue sharing payments rather than a fixed annual recordkeeping fee charged to each participant's account. The Artisan Mid Cap Value Fund shared 7 bps in revenue sharing with Vanguard. Upon information and belief, Vanguard also received internal revenue sharing from the Vanguard investor share class mutual funds—the high-priced share class. These asset-based payments were assessed as a percentage of the assets Plan participants have invested in each investment option that shares or credits revenue to Vanguard each year.

75.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Vanguard, the Plan's participant level (roughly 60,000), and the recordkeeping market, the outside

limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant.

76.     Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor, and, upon information and belief, on the internal revenue share allocated to Vanguard as recordkeeper from the Vanguard investor share class mutual funds, the Plan paid approximately $80 to $94 per participant per year from 2010 to 2013, over 210% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

77.     As of September 30, 2013, Anthem instituted a flat $42 annual recordkeeping fee charged to each participant's account to compensate Vanguard for providing recordkeeping services to the Plan. Even though Anthem instituted a flat annual recordkeeping fee, the Plan's recordkeeping fee continues to exceed a reasonable fee by at least 40% for these services.

78.     The Plan has increased in total assets by over 54% from $3.3 billion as of December 31, 2010, to $5.1 billion as of December 31, 2014. Because the revenue sharing payments are asset based, the recordkeeping fees received by Vanguard increased during this time period even though the administrative services provided to the Plan remained the same. Anthem could have and should have capped the amount of revenue sharing to ensure that excessive amounts were returned to the Plan but failed to do so.

79.     Upon information and belief, Anthem also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Anthem to select a recordkeeper charging reasonable fees, to negotiate a reduction in recordkeeping fees, and to rebate any excess expenses paid by participants for recordkeeping services.

80.     Anthem failed to prudently monitor and control Vanguard's recordkeeping compensation to ensure that only reasonable fees were charged for recordkeeping and administrative services.

81.     Had Anthem ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings through unreasonable recordkeeping fees.

### Imprudent Retention of Money Market Fund

82.     Stable value funds are a common investment in large defined contribution plans and in fact are designed specifically for use in such plans. Stable value funds are conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between*

32

*Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006)(In contrast to money market funds, stable value funds "can invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").

83.     In addition to longer duration instruments generating excess returns over money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

84.     Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[19]

85.     According to the 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[20] The study also notes that stable value returns were *"more than double"* the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90%of financial advisors to defined contribution plans "agree that stable

---

[19] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.
[20] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

86.    Unlike the vast majority of 401(k) plans, the Plan does not offer a stable value fund. Instead, the Plan offered the microscopically, low-yielding Vanguard Prime Money Market Fund. This money market fund was added to the Plan in early 2006 when Vanguard was selected as the Plan's recordkeeper, eliminating the Plan's stable value fund managed by State Street.[21] Anthem also periodically eliminated stable value funds offered by 401(k) plans that later merged into the Plan, transferring those assets to the Vanguard money market fund.

87.    For the five years prior to this year, from 2010 to 2014, the Plan's money market fund earned, *at most*, 6 bps—six one hundredths of one percent—an amount which does not even come close to keeping up with inflation.[22]

88.    Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the returns of a typical stable value fund. The returns of the funds in the Hueler universe on average have far exceeded the returns of the Vanguard Prime Money Market Fund in the Plan.[23]

---

[21] See WellPoint, Inc. Form 11-K (Dec. 31, 2006), available at http://www.sec.gov/Archives/edgar/data/1156039/000119312507134752/d11k.htm.

[22] This minimal return is similar for the year 2015 through the last month of the year to date.

[23] Money market investment returns were obtained from Morningstar. For the Vanguard money market fund from 2010 to 2013, VMMXX investment returns were used. For 2014 and 2015, VMRXX investment returns were used. For the investment return as of September 30, 2015, see the fund's prospectus dated Dec. 14, 2015, available at http://www.sec.gov/Archives/edgar/data/106830/000093247115009322/mmrfinal485b.htm.



89.    Hueler Index returns over the preceding 3, 5, 10, 15 and 20 years reflect similar disparities between money market funds and stable value investments.

90.    In light of stable value funds' clear advantages and enhanced returns compared to other fixed income options, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would consider using a stable value fund. Anthem imprudently and disloyally failed to provide a stable value fund for the Plan. Anthem failed to adequately consider a stable value fund after selecting Vanguard as the Plan's recordkeeper and offering

35

Vanguard investments, or come to a reasoned decision as to its course of action, weighing the benefits of a stable value fund compared to a money market fund.

91.    Had the amounts invested in the Vanguard Prime Money Market Fund instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index, from December 29, 2009 to September 30, 2015, Plan participants would not have lost over $65 million in their retirement savings, and continue to suffer additional losses to the present, as a result of the fund being retained in the Plan.[24]

## ERISA'S FIDUCIARY STANDARDS

92.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
>> (i) providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

93.    Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here,

---

[24] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

> the assets of a plan shall never inure to the benefit of any
> employer and shall be held for the exclusive purposes of
> providing benefits to participants in the plan and their
> beneficiaries and defraying reasonable expenses of
> administering the plan.

94.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

95.    ERISA's fiduciary duties are "the highest known to the law" and must be done "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8.

96.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with respect
> to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes
>        to conceal, an act or omission of such other fiduciary,
>        knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the
>        administration of his specific responsibilities which give
>        risk to his status as a fiduciary, he has enabled such other
>        fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

97.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

98.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

99.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Anthem 401(k) Plan (formerly the WellPoint 401(k) Retirement Savings Plan) from December 29, 2009 through the date of judgment, excluding the Defendants.

38

100. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 59,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent

or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

101.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

102.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a. Schlichter, Bogard & Denton has been appointed as class counsel in 15

other ERISA class actions regarding excessive fees in large defined contribution

plans. As a district court in one of those cases recently observed: "the firm of

Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a

pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v.*

*Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill.

July 17, 2015). Other courts have made similar findings: "It is clear to the Court

that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee

litigation "and is the only firm which has invested such massive resources in this

area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816

at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation,

Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its

clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D.

Ill. Oct. 15, 2013). In another 401(k) fee case, the District Court stated: "Litigating

this case against formidable defendants and their sophisticated attorneys required

Class Counsel to demonstrate extraordinary skill and determination." *Beesley v.*

*Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

b. The U.S. District Court Judge G. Patrick Murphy recognized the work

of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general risking
> large sums of money and investing many thousands of hours for the
> benefit of employees and retirees. No case had previously been brought
> by either the Department of Labor or private attorneys against large
> employers for excessive fees in a 401(k) plan. Class Counsel performed

41

> substantial work..., investigating the facts, examining documents, and
> consulting and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the case
> required Class Counsel to be of the highest caliber and committed to
> the interests of the participants and beneficiaries of the General
> Dynamics 401(k) Plans.

*Will v. General Dynamics*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill.

Nov. 22, 2010).

      c.  Schlichter, Bogard & Denton handled the only full trial of an ERISA

excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was

affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir.

2014). In awarding attorney's fees after trial, the district court concluded that

"Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*,

No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following

remand, the district court again awarded Plaintiffs' attorney's fees emphasizing the

significant contribution Plaintiffs' attorneys have made to ERISA litigation,

including educating the Department of Labor and courts about the importance of

monitoring fees in 401(k) plans.

> Of special importance is the significant, national contribution made by
> the Plaintiffs whose litigation clarified ERISA standards in the context
> of investment fees. The litigation educated plan administrators, the
> Department of Labor, the courts and retirement plan participants
> about the importance of monitoring recordkeeping fees and separating
> a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.*, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

      d.  Schlichter, Bogard & Denton is also class counsel in *Tibble v. Edison*

*Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a unanimous

9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will have a broad effect on defined contribution plans.

   e.  The firm's work in ERISA excessive fee class actions has been covered by the New York Times and Wall Street Journal, among other media outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[25]  Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[26]  Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[27] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015);[28] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[29] Darla Mercado, *Public Enemy No. 1 to 401(k) Profiteers*, INVESTMENTNEWS (Jan. 26, 2014).[30]

---

[25] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[26] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[27] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[28] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[29] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[30] Available at http://www.investmentnews.com/article/20140126/REG/301269992/public-enemy-no-1-for-401-k-profiteers.

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees

103.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

104.    This Count alleges breach of fiduciary duties against all Defendants.

105.    The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

106.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

107.    Defendants selected and retained as Plan investment options mutual funds with excessively high fees relative to far less expensive investment options, including lower-cost share class mutual funds with the identical investment manager and investments, separate accounts, and collective trusts that were readily available to this jumbo Plan at all relevant times. In so doing, Defendants

44

failed to make Plan investment decisions based solely on the merits of the investment funds and the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

108.   Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

109.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

110.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

111. Plaintiffs restate and incorporate herein the preceding allegations of this complaint.

112. This Count alleges breach of fiduciary duties against all Defendants.

113. The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries and defraying reasonable expenses of administering the plan, and acting with the care, skill, prudence, and diligence required by ERISA.

114. If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

115. Defendants failed to engage in a prudent and loyal process for the selection and retention of a Plan recordkeeper. Defendants failed to solicit competitive bids from vendors on a flat per participant fee, and only effective

46

September 30, 2013, did Defendants institute a flat per participant fee, which, though a lower fee, still remains in excess of a reasonable fee for such services. Defendants allowed and continue to allow the Plan's recordkeeper to receive asset-based revenue sharing and hard dollar fees charged to participants, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeeper grew, even though the services provided by the recordkeeper remained the same. This caused the recordkeeping compensation paid to the recordkeeper to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

116.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

117.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

**Breach of Duties of Loyalty and Prudence— Failure to Consider the Use of a Stable Value Fund Instead of a Money Market Fund, Failure to Provide a Stable Value Fund, and Failure to Remove the Money Market Fund**

118. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

119. This Count alleges breach of fiduciary duties against all Defendants.

120. The scope of the fiduciary duties and responsibilities of these Defendants includes direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.

121. Defendants maintained as a Plan investment option the Vanguard Prime Money Market Fund. This fund, which holds very short-term, minimally yielding instruments, was expected to generate and generated only microscopic returns for consecutive years that did not even come close to keeping pace with inflation. As a result, this investment option did not provide any meaningful retirement benefits to participants, and, in fact, participants in the money market fund fell farther behind inflation each year in the fund.

122. Prudent fiduciaries of defined contribution plans know that such minimally returning funds will not and have not kept pace with inflation. However, these Defendants failed to make a reasoned decision whether to use a stable value fund, which invests in medium-term instruments that have consistently provided much greater return than money market funds while offering greater protection

through a guarantee. Had Defendants considered a stable value fund and weighed the benefits and higher returns relative to a money market fund, they would have provided a stable value fund, removed the Plan's money market fund, and selected a stable value fund, which would have provided far higher returns than the money market fund without any greater increase in risk. Maintaining this fund in the Plan, while failing to offer a stable value fund as a core investment option, caused the Plan millions of dollars in losses compared to what the assets of the fund would have earned if invested in a stable value fund.

123.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

124.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Failure to Monitor Fiduciaries

125.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

126.    This Count alleges breach of fiduciary duties against the Board of Directors of Anthem, Inc., and the individual directors.

127.    The Board of Directors of Anthem, Inc. is responsible for appointing and removing members of the Pension Committee.

128.    Given that the Board of Directors had explicit fiduciary responsibility to appoint and remove members of the Pension Committee, the Board of Directors and its individual members had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Pension Committee.

129.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

130.    To the extent any of the Board of Directors' fiduciary responsibilities were delegated to another fiduciary, the Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

131.    Defendants breached their fiduciary monitoring duties by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b. failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments, a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same, and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d. failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options to such a jumbo plan, including lower-cost share classes of the identical mutual funds, still lower cost separate accounts, and even lower cost collective trusts, that charged far lower fees than the Plan's mutual fund options; and

e. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive-cost investments, and an option that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

132.   As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars in their retirement savings.

133.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

134.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V

### Refusal to Supply Requested Information

135.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

136.   This Count alleges violations against the Pension Committee of ATH Holding Company, LLC.

137.   As the Plan Administrator, the Pension Committee is obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4). If the Pension Committee fails to provide the material requested within 30 days, the court may assess a penalty against it in favor of the participant in the amount of $110 a day from the date of such failure or refusal. 29 U.S.C. §1132(c)(1); 29 U.S.C. §2575.502c-1.

138.   On October 5, 2015, Plaintiffs' counsel sent a letter to the Pension Committee, as the Plan Administrator, on behalf of Named Plaintiff Bell requesting information under 29 U.S.C. §1024(b). The request for information was directed to the Plan Administrator at 120 Monument Circle, Indianapolis, IN 46204, consistent with the instructions provided by Anthem, Inc. to participants in the Plan's summary plan description. The letter was refused upon delivery and returned to Plaintiffs' counsel.

139.   On October 27, 2015, Plaintiffs' counsel sent a second letter to the Plan Administrator at the same address on behalf of Named Plaintiff Bell requesting Plan information under 29 U.S.C. §1024(b). The letter was again refused upon delivery and returned to Plaintiffs' counsel.

140.   To date, the Pension Committee has not complied with Named Plaintiff Bell's request for information.

141.   Based on the Pension Committee's refusal to comply with Named Plaintiff Bell's request for information, the Pension Committee violated its statutory obligations under 29 U.S.C. §1024(b)(4).

142.   The Pension Committee is liable for its violations of 29 U.S.C. §1024(b)(4) as alleged in this Count.

## JURY TRIAL DEMANDED

143.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

December 28, 2015

Respectfully submitted,

SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
Troy A. Doles, MO No. 47958*
Kurt C. Struckhoff, MO No. 61873*
Heather Lea, MO No. 49872*
100 South Fourth Street
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-7151
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
kstruckhoff@uselaws.com
hlea@uselaws.com
    *applying to be admitted *Pro Hac Vice*

Attorneys for Plaintiffs